# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO

**Quintin Slaughter,**
**On behalf of himself and**
**all others similarly situated,**

Case No. 1:18cv2705

                **Plaintiff,**

**JUDGE PAMELA A. BARKER**

   **-vs-**

**Lincoln Electric Company,**

**MEMORANDUM OPINION AND ORDER**

                **Defendant**

Currently pending is Plaintiff Quintin Slaughter's Motion for Conditional Certification and Court-Authorized Notice. (Doc. No. 24.) Defendant Lincoln Electric Company filed a Brief in Opposition on August 9, 2019 (Doc. No. 30), to which Plaintiff responded on August 23, 2019 (Doc. No. 31.) For the following reasons, Plaintiff's Motion is GRANTED IN PART and DENIED IN PART, as follows.

## I.  Procedural Background

On November 20, 2018, Plaintiff Quintin Slaughter ("Plaintiff" or "Slaughter") filed a Collective and Class Action Complaint on behalf of himself and all others similarly situated against Defendant Lincoln Electric Company ("Defendant" or "Lincoln Electric"), alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* and the Ohio Minimum Fair Wage Standards Act ("OMFWSA"), Ohio Rev. Code § 4111.01 *et seq.* (Doc. No. 1.)

Plaintiff thereafter filed a First Amended Collective and Class Action Complaint against Defendant on June 5, 2019, also alleging violations of the FLSA and OMFWSA. (Doc. No. 23.) Of particular relevance, Plaintiff alleges that Defendant violated the FLSA by failing to pay Plaintiff and

putative Collective Class members for overtime hours worked before and after the end of their shifts. (*Id*. at ¶ 52.)

Defendant answered the First Amended Complaint on June 19, 2019. (Doc. No. 25.) A Case Management Conference ("CMC") was conducted, at which time deadlines were set for conditional certification briefing. *See* Non-Document Order dated May 6, 2019.

Plaintiff filed a Motion for Conditional Certification and Court-Authorized Notice with respect to his FLSA claim on June 18, 2019. (Doc. No. 24.) Therein, Plaintiff sought to conditionally certify a class consisting of "[a]ll former and current non-exempt employees employed by Defendant at one of Defendant's Ohio facilities who worked forty (40) or more hours in one or more workweeks within three years preceding the date of filing of this Complaint to the present." (*Id*. at p. 1.) Defendant responded on August 9, 2019, and Plaintiff filed a reply on August 23, 2019.[1] (Doc. Nos. 30, 31.)

## II. Factual Allegations

Defendant Lincoln Electric Company manufactures welding products, including welding equipment and welding wire and flux. (Doc. No. 30-1 at ¶ 2.) Defendant has manufacturing facilities in Euclid and Mentor, Ohio, at which it employs both hourly and piece rate employees. (*Id.* at ¶¶ 3-7.) Each of these facilities has multiple departments, with 72 departments housed at the Euclid facility and 13 departments at the Mentor facility. (*Id*. at ¶ 8.)

---

[1] The docket reflects that consent forms have been filed by the following fifteen opt-in plaintiffs: Abraham Sanders, Diamond Hubbard, Joseph Salerno, Lester Williams, Jonathan Law, Deangelo Collier, Rodrigo Montgomery, Matthew Snodgrass, Gerald Sanders, Neil Brown, Sonya Richardson, George Carson, Jason Harris, Jimmy Thomas, and Richard Malek. (Doc. Nos. 6, 9, 12, 13, 14, 17, 20, 21, 32, 33, 34.)

2

Plaintiff Quintin Slaughter worked at Defendant's Euclid facility as a piece rate employee from approximately June 2018 to February 2019. (Doc. No. 24-1 at ¶ 3-4.) Plaintiff Slaughter submitted a Declaration in support of his Motion for Conditional Certification, in which he avers (in relevant part) as follows:

> 6. I generally reported to work 15 minutes or more before the start of my shift. I typically clocked in approximately 5-7 minutes or more before the start of my shift. Before clocking in, I would put on my personal protective equipment, including but not limited to, safety glasses and ear plugs. I would then check the sheet by the time clock to see where I was working for the day. After that, I reported to my work area and begin [sic] working.
>
> 7. I observed other employees clocking in before the start of the shift and reporting to their work areas.
>
> 8. Even though I was clocked in and working 5-7 minutes or more before the start of my shift, I was not paid for this time.
>
> 9. At the end of my workday, I walked from my work area to the time clock and clocked out.

(*Id.* at ¶¶ 6-9.) Plaintiff also submitted the Declarations of four opt-in Plaintiffs (Matthew Snodgrass, Gerald Sanders, Abraham Sanders, and DeAngelo Collier), each of whom worked as piece rate employees at Defendant's Euclid facility. (Doc. Nos. 24-2, 24-3, 24-4, 24-6.) Like Slaughter, these employees aver that they reported to work 15-20 minutes before their shift, put on their protective equipment before clocking in, and then clocked in approximately 5 to 10 minutes before the start of their shifts. (*Id.*) They each averred that, even though they clocked in and started working 5 to 10 minutes or more before the start of shift, they were not paid for this time. (*Id.*) Finally, they each stated that they observed other employees clocking in before the start of their shifts. (*Id.*)

In addition, Plaintiff submitted the Declaration of opt-in Plaintiff Diamond Hubbard, who worked as an hourly employee at Defendant's Euclid Facility. (Doc. No. 24-5.) Ms. Hubbard

3

averred that she reported to work 15 minutes before the start of her shift and clocked in approximately 5 to 7 minutes before the start of her shift. (*Id*.) Immediately after clocking in, Ms. Hubbard gathered her tools and reported to her work area to set up. (*Id*.) She averred that "even though I clock in and start working 5 to 7 minutes or more before the start of my shift, I am not paid for this time." (*Id*.) Finally, Ms. Hubbard states that "at the end of my workday, I walked from my work area to the time clock and clocked out." (*Id*.)

Finally, Plaintiff relies on his counsel's summary of Defendant's daily time punch records for Plaintiff Slaughter and the opt-in Plaintiffs, which "contain thousands of lines of data, including Plaintiffs' daily punch in and punch out records and the amount of hours that Lincoln Electric counted as hours worked per day." (Doc. No. 24-7.) This summary states as follows:

| Number of workdays which contain Punch in and Punch Out | 2, 259 | 100.00% |
| --- | --- | --- |
| Number of workdays where punches were rounded in favor of Employer | 2, 223 | 98.41% |
| Number of workdays where punches were rounded in favor of Employee | 0 | 0.00% |
| Number of workdays without rounding | 36 | 1.59% |

Plaintiff asserts that, based on his counsel's review of Defendant's daily time punch data, Plaintiffs, on average, lost 11.76 minutes per day as a result of rounding.[2] (*Id*.)

In response, Defendants submitted a copy of the "Time Clock and Starting Time" provision in its Employee Handbook. (Doc. No. 30-1 at p. 9.) This provision states, in relevant part, as follows:

> All employees must be paid for all hours worked without exception. **Consequently, we strictly forbid employees from all off the clock work, whether before their**

---

[2] Defendant does not object to the Court's consideration of Plaintiff's "data summary" in the context of resolving the instant Motion.

4

>
> **scheduled shifts, afterwards, or during unpaid meal periods**. Employees are encouraged and expected to report all violations of this core policy to Human Resources or Payroll.
>
> **You are expected to be at your work center, bench, or desk ready to work at your scheduled starting time and after your lunch period. You must also be at your work station at quitting time.** Employees should not change clothes or wash up before their quitting time. **Hourly or piecework employees must not swipe in more than ten minutes prior to their scheduled start time, nor should they begin work prior to their scheduled start time.** Employees should swipe out immediately after ending work for the day.
>
> \*\*\*
>
> Unless preapproved by a supervisor, employees are not permitted to perform any work activities (which includes shift briefings, emails, paperwork, or picking up equipment needed for the job) outside of their scheduled shift times. You are not permitted to begin work until your scheduled starting time. \*\*\*
>
> If there are occasions when employees do any work before or after their scheduled shift, (or during an unpaid meal period), they must be paid. Employees must promptly complete an AC256 form and submit it to their supervisor to ensure payment for all time actually worked. These forms are readily available from your supervisor, who will also be responsible for insuring a form is completed and submitted for all work performed before or after scheduled hours. Employees should notify Payroll or Human Resources immediately if AC256 forms are not available or if they are not paid for all hours worked.

(*Id.*) (emphasis added).

In addition, Defendant submitted several Declarations highlighting the differences between piece rate and hourly employees, as well as the differences between its Euclid and Mentor facilities. Kelly Kehn, the Director of Human Resources for Defendant's Cleveland Operations, averred that production employees are paid on a "piece rate system," which means that they "are not paid strictly by the hour but primarily based upon the number of goods (such as coils of welding wire) that they actually produce each shift." *See* Declaration of Kelly Kehn ("Kehn Decl.") (Doc. No. 30-1) at ¶ 3.) Ms. Kehn noted that there are currently 758 piece rate workers and 981 hourly workers at the Euclid

5

facility, which houses 72 departments. (*Id*. at ¶¶ 7, 8.) The Mentor facility, on the other hand, is smaller, with 319 piece rate workers, 156 hourly workers, and 13 departments. (*Id*. at ¶¶ 6, 8.)

With regard to the differences between the two facilities, Defendant submitted evidence that certain departments at the Mentor facility are quite large, requiring employees to walk "for several minutes" to travel between the time clocks and their stations. *See* Nameth Decl. at ¶ 3, 8. Defendant also submitted evidence that departments differ from each other with regard to how many shifts they run each day, with some departments operating three shifts per day around the clock and others operating only two shifts. *See* Declaration of Keith Smith ("Smith Decl.") (Doc. No. 30-2) at ¶ 2; Declaration of Kevin Nick ("Nick Decl.") (Doc. No. 30-3) at ¶ 4; Declaration of Slobodan Popovich ("Popovich Decl.") (Doc. No. 30-4) at ¶¶ 3, 4; Declaration of Steven Nameth ("Nameth Decl.") (Doc. No. 30-5) at ¶ 2. In addition, Defendant submitted evidence that certain departments require their employees to attend ten-minute stretching sessions at the start of their shift before they do any work, while other departments do not have this requirement. *See* Smith Decl. at ¶ 8; Nick Decl. at ¶ 6-8, 10; Popovich Decl. at ¶ 7. Defendant also submitted Declarations demonstrating that personal protective equipment requirements vary from department to department and job to job. For example, while production employees are generally required to wear steel-toed shoes, ear protection and safety glasses, some of those workers are also required to wear additional gear such as bump caps, hard hats, welding aprons, masks, gloves, and (in certain cases) respirators. *See* Smith Decl. at ¶ 13; Nick Decl. at ¶ 13; Popovich Decl. at ¶ 11; Nameth Decl. at ¶ 10.

Lastly, Defendant submitted evidence that supervisors did not generally observe employees working before or after their shifts but, when they did, they specifically instructed those employees not to do so. *See, e.g*., Smith. Decl. at ¶ 11; Nick Decl. at ¶ 15; Popovich Decl. at ¶ 5; Nameth Decl.

6

at ¶ 9. One supervisor, Steve Nameth, averred that there are some employees (mostly "veteran piece workers") who come in and punch in early ten minutes before their first shifts but stated "it is not expected or required" and "we do not instruct the employees to come and punch in early." Nameth Decl. at ¶ 5. Mr. Nameth further explained that, if an employee does punch in early, "they will typically walk to their work area." (*Id*. at ¶ 6.) In Mr. Nameth's opinion, "ten minutes is not enough time for someone to punch in, make their way to their line, and start working." (*Id*. at ¶ 8, 9.)

**III.    Legal Standard for Conditional Certification**

Under the FLSA, an employer must generally compensate an employee "at a rate not less than one and one-half times the regular rate at which he is employed" for work exceeding 40 hours per week. *See* 29 U.S.C. § 207(a)(1); *Monroe v. FTS USA, LLC, et al.*, 860 F.3d 389, 396 (6th Cir. 2017). "Congress passed the FLSA with broad remedial intent" to address "unfair method[s] of competition in commerce" that cause "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." *Keller v. Miri Microsystems, LLC*, 781 F.3d 799, 806 (6th Cir. 2015). As the Sixth Circuit has explained, "the provisions of the statute are 'remedial and humanitarian in purpose,' and 'must not be interpreted or applied in a narrow or grudging manner.'" *Monroe*, 860 F.3d at 397 (quoting *Herman v. Fabri-Centers of Am., Inc*., 308 F.3d 580, 585 (6th Cir. 2002)).

To effectuate Congress' remedial purpose, the FLSA authorizes collective actions "by any one or more employees for and on behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). Unlike class actions under Fed. R. Civ. P. 23, collective actions under the FLSA require putative class members to opt into the class. *Id. See also Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006) (to participate in FLSA collective actions, "all

7

plaintiffs must signal in writing their affirmative consent to participate in the action."). "These opt-in parties are party plaintiffs, unlike absent class members in a Rule 23 class action." *O'Brien v. Ed Donnelly Enterprises, Inc*., 575 F.3d 567, 583 (6th Cir. 2009), *abrogated on other grounds by Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663 (2016).

Only similarly situated employees are permitted to "opt into" an FLSA collective action. *Comer*, 454 F.3d at 546. The FLSA does not define the term "similarly situated" and neither has the Sixth Circuit. *See Myers v. Marietta Memorial Hospital*, 201 F.Supp.3d 884, 890 (S.D. Ohio 2016); *Castillo v. Morales, Inc*., 302 F.R.D. 480, 483 (S.D. Ohio 2014); *Rosenbohm v. Cellco Partnership*, 2018 WL 4405836 at * 1 (S.D. Ohio Sept. 17, 2018). Courts generally use a two-stage approach to determine this issue. *See Comer*, 454 F.3d at 546-547; *Houston v. Progressive Cas. Ins. Co.,* 2015 WL 8527339 at * 1 (N.D. Ohio Dec. 11, 2015). At the first stage, which generally occurs before the parties have conducted discovery,[3] "a court must determine whether to conditionally certify the collective class and whether notice of the lawsuit should be given to putative class members." *See Hamm v. Southern Ohio Medical Center*, 275 F.Supp.3d 863, 874 (6th Cir. 2017). During the second stage, the court makes a final determination regarding whether opt-in class members are similarly situated based upon a thorough review of the record after discovery is completed. *See, e.g., Marek v. Toledo Tool & Die,* 2017 WL 5891765 at * 2-3 (N.D. Ohio Nov. 29, 2017); *Houston*, 2015 WL 8527339 at * 1.

---

[3] As another court in this district has explained, "[b]ecause the statute of limitations on an FLSA claim continues to run until written consent is filed with the court, it is important that notice of the collective action be given to all potential opt-in plaintiffs as soon as practicable so they can decide whether to participate in the lawsuit." *Atkinson v. TeleTech Holdings*, 2015 WL 853234 at * 2 (S.D. Ohio Feb. 26, 2015). *See also Lewis v. Huntington Nat'l Bank*, 789 F.Supp.2d 863, 867 (S.D. Ohio 2011).

Because the first stage is conducted prior to (or at the beginning of) the discovery process, plaintiffs need only make a "modest factual showing" that they are similarly situated to proposed class members. *See Comer*, 454 F.3d at 546-547; *Myers*, 201 F.Supp.2d at 890; *Waggoner v. U.S. Bancrop*, 110 F.Supp.3d 759, 764 (N.D. Ohio 2015). The standard at this stage is "fairly lenient . . . and typically results in 'conditional certification' of a representative class."[4] *Comer*, 454 F.3d at 547. *See also Myers*, 201 F.Supp.3d at 890; *Lewis*, 789 F.Supp.2d at 868; *Atkinson,* 2015 WL 853234 at * 2. "In order to establish that other employees are similarly situated to the named plaintiff, the named plaintiff need only show that [his] position [is] similar, not identical, to the positions held by putative class members." *Pritchard v. Dent Wizard Intern. Corp.*, 210 F.R.D. 591, 595 (S.D. Ohio 2002). *See also Comer*, 454 F.3d at 546-547; *Lewis,* 789 F.Supp.2d at 867. Thus, similarly situated class members under the FLSA are those whose causes of action accrued in approximately the same manner as those of the named plaintiffs. *See Lewis*, 789 F.Supp.2d at 868; *Atkinson*, 2015 WL 853234 at * 2.

Courts have also found that plaintiffs are similarly situated "when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all plaintiffs." *O'Brien*, 575 F.3d at 585. Proof of a "unified policy" of violations is not required, however. *Id. See also Myers*, 201 F.Supp.3d at 890 (same); *Marek*, 2017 WL 5891765 at * 2 ("But, by the same token, 'showing a 'unified policy' of violations' is not a hard and fast requirement."). Employees may also be similarly situated if "their claims are unified by

---

[4] The FLSA does not import "the more stringent criteria for class certification under Fed. R. Civ. P. 23" and it is also "less stringent than [the] Rule 20(a) requirement that claims 'arise out of the same action or occurrence' for joinder to be proper[.]" *O'Brien*, 575 F.3d at 584. *See also Ouellette v. Ameridial, Inc.*, 2017 WL 2972636 at * 2 (N.D. Ohio July 12, 2017).

9

common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct." *O'Brien,* 575 F.3d at 585. *See also Marek*, 2017 WL 5891765 at * 2.

The lead plaintiffs bear the burden of demonstrating that the proposed class members are similarly situated to the lead plaintiff. *See O'Brien*, 575 F.3d at 584; *Myers,* 201 F.Supp.3d at 890. In terms of proof, courts consider "whether potential plaintiffs were identified; whether affidavits of potential plaintiffs were submitted; and whether evidence of a widespread plan was submitted." *Myers*, 201 F.Supp.3d at 890. *See also Lewis*, 789 F.Supp.2d at 868. However, at the conditional certification stage, a court "does not generally consider the merits of claims, resolve factual disputes, or evaluate credibility." *Waggoner,* 110 F.Supp.3d at 765. *See also Myers*, 201 F.Supp.3d at 890. Indeed, "requiring additional factual support, or weighing the defendant's competing factual assertions prior to discovery, would 'intrude improperly into the merits of the action.'" *Hamm*, 275 F.Supp.3d at 874 (quoting *Lacy v. Reddy Electric Co.*, 2011 WL 6149842 at * 3 (S.D. Ohio 2011)). *See also Murton v. Measurecomp LLC*, 2008 WL 5725631 at * 5 (N.D. Ohio June 9, 2008).

The decision to conditionally certify a class, and thereby facilitate notice, is "within the discretion of the trial court." *Castillo*, 302 F.R.D. at 483. *See also Comer*, 454 F.3d at 546; *Hamm*, 275 F.Supp.3d at 874. If conditional certification is granted, "plaintiffs are permitted to solicit opt-in notices, under court supervision, from current and former employees." *Myers*, 201 F.Supp.3d at 890 (quoting *Cornell v. World Wide Bus. Servs. Corp.*, 2015 WL 6662919 at * 1 (S.D. Ohio Nov. 2, 2015)).

At the second stage of the certification process, a defendant may file a motion to decertify the class. During the second stage, the court makes a final determination on whether opt-in class members are similarly situated based upon a thorough review of the record after discovery is

10

completed. *See Houston*, 2015 WL 8527339 at * 1; *Schwab v. Bernard*, 2012 WL 1067074 (N.D. Ohio March 28, 2012). This final certification decision is normally based on a variety of factors, including "factual and employment settings of the individual [ ] plaintiffs, the different defenses to which the plaintiffs may be subject on an individual basis, [and] the degree of fairness and procedural impact of certifying the action as a collective action." *O'Brien*, 575 F.3d at 584 (citations omitted).

## IV.     Analysis

### A.     Conditional Certification

In the Amended Complaint, Plaintiff alleges that he and the putative collective class members "typically clocked in 5 – 10 minutes or more before the start of their shifts" in order to put on certain personal protective equipment ("PPE"). (Doc. No. 23 at ¶ 24, 26.) He alleges that they were required by Defendant and OSHA to put on this equipment and, further, that "the act of donning the PPE was done for Defendant's benefit and was required for Plaintiff [and] the Collective Class members . . . to perform their job duties." (*Id*. at ¶ 26.) Plaintiff asserts that he and the putative collective class members "put on their PPE within seconds of clocking in" and immediately thereafter reported to their work areas and began working. (*Id.* at ¶ 27, 28.) Plaintiff alleges that, despite the fact that he and the putative collective class members were clocked in and working, "Defendant did not pay them for any time spent working prior to their scheduled shift time," resulting in them not being paid all of their overtime compensation. (*Id.* at ¶ 29, 30.) The Amended Complaint also alleges that Plaintiff and the putative collective class members remained working beyond the end of their shifts but were not paid for "any time spent working after their scheduled shift end time." [5] (*Id.* at ¶ 33.)

---

[5] Plaintiff also alleges that Defendant failed to include non-discretionary bonuses in Plaintiff's and the putative collective class action member's regular rates of pay for purposes of computing overtime compensation. (*Id*. at ¶ 36.) Neither the instant Motion or any of the Declarations submitted in support thereof address the issue of non-discretionary bonuses.

11

In his Motion, Plaintiff argues conditional certification is warranted because both the piece rate and hourly workers at the Mentor and Euclid facilities were subject to Defendant's policy of knowingly failing to pay for pre-shift work. (Doc. No. 24.) Plaintiff maintains that the six declarations submitted in support of his Motion (along with the data summary) are more than sufficient to satisfy the "modest factual showing" necessary to warrant conditional certification of a class consisting of "all former and current non-exempt employees employed by Defendant at its Ohio facilities who worked forty or more hours in one or more workweeks within three years preceding the date of the filing of this Complaint to the present." (*Id*. at p. 1.)

Defendant argues conditional certification should be denied because Plaintiff has failed to identify a policy or practice that violates the FLSA. (Doc. No. 30.) Specifically, Defendant maintains that "Plaintiff has identified no Lincoln Electric policy that requires all piece workers and hourly employees to start their shifts early, continue working after clocking out for the day, and not report the time as hours worked." (*Id*. at p. 13.) Moreover, Defendant asserts Plaintiff has failed to identify a single supervisor or manager who imposed such a requirement on all piece rate and hourly workers. (*Id.*)

Defendant further argues that conditional certification should be denied because of the inherently individualized nature of Plaintiff's and the putative class members' claims. (*Id*. at p. 14.) Defendant maintains that piece rate and hourly workers are not similarly situated because the former are compensated based on production and therefore have an incentive to work "off the clock," whereas hourly workers do not share this same incentive. (*Id*.) Defendant also emphasizes that only one of the six Declarations submitted in support of Plaintiff's Motion is from an hourly employee, Diamond Hubbard. (*Id*.) Defendant asserts that Ms. Hubbard only describes her personal experiences

12

and does not provide any testimony that she witnessed any other hourly employee working prior to his/her shift. (*Id*. at pp. 13-15.) With regard to the differences between the Mentor and Euclid facilities, Defendant argues that "the needs and requirements [of the two facilities] are different, as well as the physical make-up of the departments, locations of time clocks, and parking lot sizes." (*Id*.) In sum, Defendant argues that the declarations submitted by Plaintiff in support of his Motion are "facially insufficient" because they use "cookie cutter" language and fail to allege anything more than "purely individualized claims." (*Id*. at p. 9.)

For the following reasons, the Court finds Plaintiffs[6] have satisfied the modest factual showing necessary to demonstrate that they are similarly situated to other piece rate employees at Defendant's Euclid and Mentor facilities for purposes of conditional certification. Plaintiffs have not, however, satisfied their burden with respect to Defendant's hourly employees.

As a threshold matter, the Court finds that Plaintiffs have alleged a common theory of Defendant's alleged statutory violations. *See O'Brien*, 575 F.3d at 585; *Marek,* 2017 WL 5891765 at * 2. Plaintiffs Slaughter, Snodgrass, Gerald Sanders, Abraham Sanders, and Deangelo Collier provide declarations, in which they each state that they (1) were paid on a piece rate basis; (2) generally reported to work early and clocked in before their shifts; (3) put on their personal protective equipment before clocking in; and (4) immediately reported to their work area and began working. (Doc. Nos. 24-1, 24-2, 24-3, 24-4, 24-6.) Each also states that, even though they were clocked in and working 5 to 10 minutes or more before the start of their shifts, they were not paid for this time. (*Id*.) They also aver that they "observed other employees clocking in before the start of the shift and

---

[6] Hereinafter, the Court will refer to Plaintiff Slaughter and the opt-in Plaintiffs collectively as "Plaintiffs."

13

reporting to their work areas." (*Id.*)  These allegations are sufficient to meet Plaintiff's modest burden of showing that piece rate employees at Defendant's facilities share a common theory of alleged violations and are, thus, similarly situated.

Defendant argues, however, that conditional certification should be denied because Plaintiffs have not identified an *illegal* policy or practice affecting the putative class.  Specifically, Defendant maintains that its Employee Handbook expressly forbids employees from "all off the clock work." (Doc. No. 30-1 at p. 9.)  Defendant notes that the Handbook allows employees to "swipe in" ten minutes early to ensure that they are ready to work at their scheduled start time but directs them not to actually begin work until their shift starts.  (*Id.*)  Defendant maintains that this policy does not violate the FLSA and, therefore, conditional certification is unwarranted.

The Court finds this argument to be without merit.  As an initial matter, Plaintiffs have set forth allegations identifying an illegal policy or practice affecting the putative class.  Specifically, Plaintiffs allege that they routinely arrive early in order to put on personal protective equipment that they are required to wear to perform their job duties, but are not paid for this time.[7]  Defendant's substantive arguments that its policies and procedures do not, in fact, violate the FLSA go the merits of the instant action and are not properly considered at the conditional certification stage.  *See, e.g., Waggoner*, 110 F.Supp.2d at 769 ("It would be inappropriate to consider the merits of defendant's defense at this time, before the record has been developed."); *Hamm*, 275 F.Supp.3d at 876 (at conditional certification stage, refusing to consider defendant's argument that plaintiff cannot show the existence of an unlawful common plan or policy because "this argument relates to the merits of

---

[7] *See Integrity Staff Solutions, Inc. v. Busk*, 574 US 27, 135 S.Ct. 513, 190 L.Ed.2d 410 (2014) (finding that employers must compensate employees for time spent doing preliminary or postliminary activities but only if those activities are "integral and indispensable" to an employee's principal work activities).

14

Plaintiff's claims and is not relevant at this stage of the proceedings"); *Luster v. AWP, Inc.*, 2017 WL 3140697 at * 2 (N.D. Ohio July 25, 2017) ("Questions of fact (what duties employees performed and whether they were paid for them) and questions of law (whether the alleged conduct constitutes a violation) are questions on the merits and therefore not appropriate for the notice stage of conditional certification").

Defendant also argues certification should be denied because Plaintiffs have failed to come forward with any evidence that any supervisors or managers were aware that employees were not being compensated for pre-shift work. The Court rejects this argument. As noted above, Plaintiffs submitted a summary of Defendant's own payroll records, which indicates that Defendant rounded punches in its own favor 98.41% of the time, resulting in an average loss of 11.76 minutes per day per Plaintiff. (Doc. No. 24-7.) Certainly, Defendant may come forward with evidence challenging this data summary or otherwise demonstrating that it was not aware of any alleged failure to pay for pre-shift work. At this time, however, the Court finds that Plaintiff's evidence is sufficient to meet the "fairly lenient" standard for conditional certification.

The Court also rejects Defendant's arguments that conditional certification should be denied because of the inherently individualized nature of Plaintiff's and the putative class members' claims. As noted above, at this stage of the proceedings, "the Court does not resolve factual disputes . . . or make credibility determinations." *Waggoner,* 110 F.Supp.3d at 765. *See also Myers*, 201 F.Supp.3d at 890; *Douglas v. J&K Subway*, 2015 WL 770388 at * 3 (N.D. Ohio Feb. 23, 2015). As such, it is not appropriate, at this time, for the Court to consider factual issues surrounding variation in job duties, differences in the layouts of the Euclid and Mentor facilities (including the physical make-up of the departments, locations of time clocks, and parking lot sizes), and differences in PPE

requirements. *See, e.g., Heibel v. U.S. Bank Nat'l Assoc.*, 2012 WL 4463771 at *5 (S.D. Ohio Sept. 27, 2012) ("The Court finds that any detailed inquiry into . . . individualized considerations [that] may apply, or whether such consideration[s] will ultimately make the class unmanageable, is premature at this initial state prior to discovery."). Moreover, as several courts have noted, the mere existence of potentially individualized questions does not, in and of itself, bar conditional certification. *See O'Brien*, 575 F.3d at 584 (rejecting employer's argument that certification was improper when it would require an individual analysis that examines the facts of each alleged violation); *Hamm*, 275 F.Supp.3d at 877 (finding that proof of a unified theory of violations "is sufficient at this stage to justify conditional certification, even though proof of each violation will require an individual factual inquiry.") As another court in this District recently explained, "notice and discovery are required to discover which Plaintiffs have individual questions and to what extent they may predominate over the common issues." *Luster*, 2017 WL 3140697 at * 3. Thus, the Court finds that Defendant's concerns regarding the necessity for individualized inquiries are better suited to the second stage of the certification process.

The Court agrees with Defendant, however, that Plaintiff has not demonstrated that conditional certification is warranted with respect to hourly employees at either the Mentor or Euclid facilities. As Defendant correctly notes, Plaintiff submitted only one declaration from an hourly employee, Diamond Hubbard. (Doc. No. 24-5.) Therein, Ms. Hubbard stated that she was not paid for pre-shift work, which she described as "gathering her tools and reporting to her work area." (Doc. No. 24-5.) Ms. Hubbard did not aver that she observed or was otherwise aware of any other hourly

employees that clocked in early in order to perform pre-shift work but were not paid for their time.[8] (*Id.*) Nor did she aver that she was aware that other hourly employees, in fact, needed to "gather tools" or do other similar "preparatory work" prior to the start of their shifts in order to report to their work stations on time. (*Id.*) Likewise, the Amended Complaint contains no allegations relating to employees (hourly or otherwise) that were not paid for pre-shift time involving preparatory work such as gathering tools. Rather, the allegations in the Amended Complaint are specifically limited to employees that clocked in early in order to don personal protective equipment. (Doc. No. 23 at ¶ 23-28.)

The Court also agrees with Defendant that Plaintiffs have not demonstrated that conditional certification is warranted with respect to the alleged failure to pay for post-shift work. Plaintiffs have submitted no evidence that they were not paid for post-shift work. None of the Declarations submitted in support of certification state that the declarants were not paid for post-shift work. Rather, the declarants each simply state that "[a]t the end of my workday, I walked from my work area to the time clock and clocked out." (Doc. Nos. 24-1 through 24-6.) Even applying a modest and lenient standard, this is not sufficient to warrant conditional certification with respect to this issue.

Accordingly, the Court will grant conditional certification but not for the exceedingly broad class proposed by Plaintiff in his Motion. Rather, and for all the reasons set forth above, the Court will grant conditional certification for the following limited class:

---

[8] Piece rate Declarants Slaughter, Snodgrass, A. Sanders, G. Sanders, and Collier aver generally that they observed "other employees" clocking in before the start of their shift and reporting to their work areas. While this statement could be interpreted as including hourly employees, the Court is unwilling to interpret it so broadly. Plaintiffs have not presented any evidence that would allow the Court to assume that these particular Declarants (each of whom were each piece rate employees) were in a position to observe hourly employees clocking in early or otherwise be aware that they were doing so. If any of the Declarants had this knowledge, they could easily have clearly indicated so in their Declarations.

17

> All former and current piece rate employees employed by Defendant at its Mentor and Euclid facilities who performed off-the-clock pre-shift work within three years preceding the date of the filing of this Complaint to the present.

**B.     Notice**

Plaintiffs also seek an Order authorizing notice to proposed class members who were employed by Defendant during the period three years preceding the commencement of this action. (Doc. No. 24 at 1-2.) Specifically, Plaintiffs ask the Court to order Defendants to provide, within 14 days, a roster of the names, home addresses, email addresses, and dates of employment of all potential opt-ins. (*Id.*) Plaintiffs further request that the Court order the parties to jointly submit, also within 14 days, a proposed Notice informing potential opt-ins of the pendency of the instant collective action and permitting them to opt-in by submitting a Consent to Join Form. (*Id.*) Finally, Plaintiffs request that the Court order that the approved Notice be sent to potential opt-ins within 30 days and provide that duplicate copies may be sent in the event that new, updated, or corrected addresses are discovered. (*Id.*)

Defendants raise no objection to the specific procedure noted above, or to the three year time period sought by Plaintiffs.

Having conditionally certified the proposed class noted above, "the Court has the authority to supervise notice to potential plaintiffs." *Lewis*, 789 F.Supp.2d at 863. *See also Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165, 172, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989) ("By monitoring preparation and distribution of the notice, a court can ensure that it is timely, accurate, and informative.") Courts may facilitate notice to putative collective class members "so long as the court avoids communicating to absent class members any encouragement to join the suit or any approval

18

of the suit on its merits." *Hoffman-LaRoche, Inc.*, 493 U.S. at 168-169. *See also Kinder v. MAC Manufacturing, Inc.,* 318 F.Supp.3d 1041, 1047 (N.D. Ohio 2018).

Accordingly, and in the absence of any opposition as to this issue, the Court grants Plaintiffs' request to authorize notice to potential opt-in plaintiffs as defined herein, using the procedure proposed by Plaintiffs in their Motion.

### V.     Conclusion

Accordingly, Plaintiff's Motion for Conditional Certification (Doc. No. 24) is GRANTED IN PART and DENIED IN PART, as follows. The Court hereby conditionally certifies the following collective action class: "all former and current piece rate employees employed by Defendant at its Mentor and Euclid facilities who performed off-the-clock pre-shift work within three years preceding the date of the filing of this Complaint to the present."

The parties are hereby ordered to meet and confer, through counsel, regarding the content and form of notice to be given to the potential opt-ins and to submit, within fourteen (14) days of the date of this Order, a joint proposed judicial notice.[9] In addition, Defendant shall, within fourteen (14) days of the date of this Order, provide Plaintiffs with a list of the full name and last known home address of each current and former employee falling within the conditional collective action class described above, as well as their dates of employment and last known personal email address. Once approved, the Notice shall be sent to the potential opt-ins within thirty (30) days using the home and

---

[9] In drafting the proposed language, the parties should "be scrupulous to respect judicial neutrality" and "take care to avoid even the appearance of judicial endorsement of the merits of the action." *Hoffman-La Roche, Inc*., 493 U.S. at 174.

email addresses provided by the Defendant.  Duplicate copies of the Notice may be sent in the event new, updated, or corrected addresses are found for one or more potential opt-in.

**IT IS SO ORDERED.**

Date:  October 7, 2019

*s/Pamela A. Barker*
PAMELA A. BARKER
U. S. DISTRICT JUDGE